878 F.2d 382
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Patty J. ROY, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendants-Appellees.
 No. 87-5756.
 United States Court of Appeals, Sixth Circuit.
 June 27, 1989.
 
 Before ENGEL, Chief Judge, and DAVID A. NELSON and RYAN, Circuit Judges.
 PER CURIAM.
 
 
 1
 The claimant in this Social Security case appeals a district court order upholding a denial of Title II disability benefits. The claimant was clearly disabled, and the disability clearly stemmed from an automobile accident in which she had sustained serious injuries; the main question presented by the claimant's application for benefits was whether she had become disabled before her insured status expired. Social Security Ruling 83-20, which under certain circumstances equates the onset date for disabilities of traumatic origin with the date of injury, appears to dictate an affirmative answer to that question. Accordingly, we shall remand the case for an award of benefits.
 
 
 2
 * The claimant, Patty J. Roy, suffered a serious head injury in an automobile accident that occurred on July 21, 1973. As a result of the accident she was hospitalized for approximately five weeks at Louisville General Hospital. Although the hospital records are incomplete, they disclose that Mrs. Roy, who suffered a coma as a result of the accident, exhibited signs of severe mid-brain damage, including "decerebrate posturing" and a fixed dilated pupil of the right eye.
 
 
 3
 Soon after being admitted to the hospital, Mrs. Roy underwent an exploratory laparotomy for a laceration of the mesentery. Her appendix was removed in the process. After the operation the surgeon noted that although the patient had tolerated the procedure well, her prognosis was poor due to her head injury and the fact that she had aspirated vomitus into both lungs. She was subsequently placed on a respirator and treated with steroids and antibiotics for bilateral aspiration pneumonitis. On July 25 the surgeons removed Mrs. Roy's endotracheal tube and performed a tracheostomy. A chest tube was inserted on her right side to drain pleural fluid from around the lungs. Several hours later she "had seizure-like activity" for which she was placed on Dilantin, an anticonvulsant medication.
 
 
 4
 A progress note of July 26 indicated that the patient was still being maintained on the respirator. A discharge summary written four weeks later contained these entries:
 
 
 5
 "Present Illness: Pt. got an auto accident and got trauma to her head.
"Pertinent Pt. is decerebrated, Doll's [phenomenon] Negative. [Right]
 Physical angiogram showed no shift. [Left] angiogram showed some
 Findings: bowing ant[erior] cerebral. Pt. was unconscious and
 decerebrated.
"Pertinent X-ray showed normal skull, abnormality of C6 and T1,
 Laboratory Date: normal abdomen and pelvis. Bilateral pulmonary edema.
 normal I.V.P.
"Progress and Pt. was treated by steroids and antibiotics. Gradualy [sic]
 Treatment she got better but her [right] eye was not opened because
 (Include of paralysis of 3rd [cranial nerve].
 Operations):
"Final Diagnosis: Acute Brain Stem Contusion.
"Disposition and Pt. was dicharged [sic] from hospital with a rather good
 Recommendations: condition and was recommended to come to clinic [two]
 weeks later."
 
 
 6
 On September 17, 1973, Mrs. Roy was seen by her family physician, James E. Monin, M.D., who subsequently wrote that "[t]here was a question that she should not take birth control pills, since she had had such massive clotting within the brain and we were fearful of further blood clots."
 
 
 7
 Between January and July of 1974 Mrs. Roy was seen as an outpatient in the eye and neurosurgical clinics of the hospital. The notes of the resident physicians who saw her during this period indicate that her right eye remained fixed and dilated and that she suffered from diplopia (double vision) as a result.
 
 
 8
 On February 7 a neurologist found that she was recuperating well despite a right lid retraction and "jitteriness." Her medication included an anticonvulsant (Dilantin) once daily and a tranquilizer (Valium) three times a day. On May 9 the neurologist noted that she had "slight unsteadiness of gait." He recommended decreasing the dosage of Dilantin, which was being taken to prevent seizures. On June 6 the neurologist noted that she complained of right-sided headaches, minimal dystaxia (loss of coordination) on heel to toe walking, right third nerve paresis, and a "tonic-like fit" two weeks earlier. He doubled her dosage of Dilantin and prescribed Darvin for her headaches.
 
 
 9
 Mrs. Roy's husband testified that when his wife was released from the hospital,
 
 
 10
 "[h]er condition was pitiful.
 
 
 11
 * * *
 
 
 12
 * * *
 
 
 13
 "... Her condition was such that she required somebody to be with her. She could not walk by herself, she did not know--she had amnesia. Her past was wiped out. She had received brain stem contusion or it's later been diagnosed as organic brain syndrome, but her past was gone. She didn't know how old she was. She didn't know where she went to school.
 
 
 14
 * * *
 
 
 15
 * * *
 
 
 16
 "She would remember things as you told her."
 
 
 17
 In addition to loss of memory, Mr. Roy testified that his wife exhibited "odd" or "bizarre" behavior:
 
 
 18
 "She had periods that she was angry--not valid reason [sic]. She had periods that she was sad for reasons maybe that she believe [sic] to be so but weren't so, things that she would think happened that didn't happen.
 
 
 19
 * * *
 
 
 20
 * * *
 
 
 21
 "[H]er mental condition was the same then as it is now. However, we didn't take her to a psychiatrist. We tried to deal with the problem at home.
 
 
 22
 "I listed [sic] the aid of family members. My brother stayed with her while I worked. I worked of the night, he worked of the day. There was a period that he stayed with us and helped me care for her.
 
 
 23
 "We tried to deal with this at home as much as possible.... I tried to get by without professional help for a period of time.
 
 
 24
 "When it became apparent that I could no longer, we again started to see doctors."
 
 
 25
 Between 1974 and 1977 Mrs. Roy worked outside the home during three brief periods in what appear to have been rehabilitative positions or unsuccessful work attempts. The Secretary did not treat any of these jobs as substantial gainful employment.
 
 
 26
 Mrs. Roy was seen by a number of ophthalmologists, during the years following the accident, for problems with her right eye caused by damage to the brain stem. The ophthalmologists reported third cranial nerve (oculomotor) paralysis, fixed and dilated pupil, diplopia, corneal ulcer, and strabismus (squint).
 
 
 27
 Jack Blackstone, Jr., M.D., an obstetrician, saw Mrs. Roy in August of 1978 when she was in the final trimester of pregnancy. He later wrote that "throughout that pregnancy and in the years since, the patient has exhibited bizarre personality characteristics attributable to chronic brain syndrome which is felt [to have] been present since a brain stem contusion which occurred in an automobile accident in 1973."
 
 
 28
 Beginning in January of 1980, Mrs. Roy was hospitalized repeatedly for psychiatric and surgical treatment. Bryan Warren, M.D., a psychiatrist, diagnosed her condition after a two-day hospitalization on January 1-2, 1980, as "depressive neurosis with history of postraumatic amnesia." He found her prognosis to be "guarded." On July 14, 1981, a Dr. Warren wrote that Mrs. Roy was under his care for "the treatment of neurological, mental, and emotional problems which developed following her automobile accident on July 31 [sic], 1973." He further stated:
 
 
 29
 "This patient continues to demonstrate anxiety and depression as well as disorganized thinking. She is fairly handicapped and at this time the patient is disabled and unable to function in public employment. She will require long-term supportive psychotherapy and chemotherapy and it is doubtful that she will make sufficient progress to enable her to return to work. She is capable of managing her own funds. She is limited in social activities because of her physical and mental problems."
 
 
 30
 In November of 1981 Mrs. Roy was hospitalized for eight days with a discharge diagnosis of "Depression major [with]out psychotic features" and "Temporal lobe epilepsy." During this hospital stay consulting neurologist Randy Cox, M.D., described an electroencephalogram that was "abnormal" and suggestive of temporal seizure lobe disorder. He noted that Mrs. Roy had a "history of significant head injury in 1973--she was involved in an automobile accident and still has a dent in the right posterior occipital region of the head to prove it." Her medications at this time included anti-depressants, anti-anxiety medication, and anti-convulsants.
 
 
 31
 In February of 1982 Mrs. Roy was hospitalized for chronic urethritis. Her discharge diagnosis was "(1) chronic urethritis; (2) pseudopolyps; (3) atrophic right kidney with elevated renins; (4) organic brain syndrome from old injury." In May of 1982 she returned to the hospital for surgery to remove her right kidney.
 
 
 32
 On September 9, 1983, neurologist A.S. Callahan, III, M.D., treated Mrs. Roy for continuous headaches. He subsequently wrote:
 
 
 33
 "Since an automobile accident ten years ago with resultant coma, she has had nearly continuous headache as well as double vision. She has been tried on a wide variety of medications, including narcotics, all without significant relief of head pain. A single convulsion was reported to have occurred in the past, and she is on medication now for seizure prevention.
 
 
 34
 Objective studies have confirmed the presence of frontal atrophy as well as ventricular enlargement. This is a certain sign of intracranial injury.
 
 
 35
 Because of the difficult management problem posed by the headaches in Mrs. Roy's case, I would consider her disabled for all work." (Emphasis supplied.)
 
 
 36
 On March 18, 1984, Mrs. Roy was hospitalized following a two-week period in which she exhibited increasingly paranoid, irrational behavior toward her family and neighbors. Her psychiatrist, Dr. Warren, noted that she had been "using pain relievers and tranquilizers to excess in the past to relieve her headache and other various complaints that have stemmed from her automobile accident approximately 10 years earlier." A neurological examination performed by Dr. Cox during this stay "showed evidence of original brain damage with seizure disorder and evidence of strabismus." After 17 days of in-patient treatment, she was discharged with a diagnosis of "organic paranoid syndrome, secondary to excessive medication and to organic brain syndrome, secondary to her head injury." In May of 1984 Dr. Warren wrote that "this patient appears to be a moderately severe personality disorder with brain damage secondary to a head injury occurring approximately 10 years ago which ... has left her invalided from the lack of capacity to cope with life in an intelligent and mature fashion."
 
 
 37
 A 1984 report written by Jack Keeley, M.D., who treated Mrs. Roy in 1978 and 1980, stated that "my informal evaluation suggests that she has sustained considerable cortical damage which I presume is permanent." Dr. Keeley went on to say:
 
 
 38
 "I doubt if she is able to function at a normal productive level and doubt if she is capable of supporting herself by regular employment. There is no question in my mind that this lady has sustained considerable brain damage which I assume will be permanent and she will probably require some unusual consideration in terms of being able to function as a housewife and mother."
 
 
 39
 Dr. Monin, a family physician who treated Mrs. Roy before and after the accident, wrote in 1984 that her post-accident memory loss and emotional lability were "uncharacteristic" of her behavior before the accident, "and it all relates to the very severe brain injury that the patient sustained in this accident, back in July 1973. The total condition of the patient has not changed much during the past period of time."
 
 II
 
 40
 Mrs. Roy filed an application for disability benefits on December 1, 1983, alleging disability due to "brain stem contusion causing psychological, neurological and physical condition, including depression, acute vascular headaches, anxiety, disorganized thinking, kidney failure, hysterectomy, allergic rhinitis and 3rd nerve palsy." The claimed onset date was July 21, 1973. A hearing conducted after an initial denial of benefits resulted in a finding by the administrative law judge that Mrs. Roy had failed to prove that a period of disability expected to last for at least 12 months had begun on or before December 31, 1973, the last date on which she met the special earnings requirements for entitlement to Title II Social Security benefits.
 
 
 41
 Mrs. Roy then filed suit in district court. A magistrate reviewed the ALJ's decision and found it was supported by substantial evidence. The district court adopted the magistrate's findings and dismissed Mrs. Roy's complaint. This appeal followed.
 
 III
 
 42
 There appears to be little doubt that Mrs. Roy is disabled; she has, in fact, been found disabled under Sec. 1614(a)(3) of the Social Security Act, 42 U.S.C. Sec. 1382c(a)(3), and has been awarded supplemental security income on the strength of that finding. The real issue confronting the ALJ was whether the onset of the disability occurred prior to the termination of the claimant's insured status on December 31, 1973.
 
 
 43
 Mrs. Roy contends that the ALJ decided this issue incorrectly because he ignored Social Security Ruling 83-20, which provides guidelines for determining the onset date of disability in cases arising under Title II and XVI. She also contends that the ALJ erred in failing to take into account the evidence of physicians who treated her after 1973.
 
 
 44
 Social Security Ruling 83-20 provides, among other things, that for disabilities of traumatic origin, "onset is the date of the injury if the individual is ... expected to be unable to engage in substantial gainful activity ... for a continuous period of at least 12 months." (Emphasis supplied.) For disabilities of nontraumatic origin, "the date alleged by the individual should be used [as the date of the onset of disability] if it is consistent with all the evidence available."
 
 
 45
 Although it is true that the discharge summary prepared when Mrs. Roy was finally released from Louisville General Hospital on August 28, 1973, says that she was discharged "with a rather good condition," this oddly phrased observation must be considered in its context. There can be no question that Mrs. Roy had been severely injured, and on the record as a whole we see no basis for doubting the accuracy of Dr. Warren's subsequent diagnosis of "organic brain syndrome,[1] secondary to her head injury."
 
 
 46
 The ALJ acknowledged the existence of "numerous reports from various doctors indicating that the claimant is now 'disabled' due to emotional problems, severe headaches, and seizure activity, which are felt to result from the claimant's injuries in July 1973," but he discounted these medical opinions because he thought they "appear[ed] to be based on a review of her recorded medical history rather than upon actual observations by the physicians." Doctors come to conclusions on the basis of recorded medical history with some regularity, however, and the ALJ--who is not a physician, as far as we know, and who decided this case without testimony from a medical advisor--was not at liberty to analyze Mrs. Roy's symptoms as if they were totally idiopathic.
 
 
 47
 The ALJ attached considerable, and possibly controlling, significance to Mrs. Roy's failure to produce evidence, aside from ophthalmology reports, that a physician had diagnosed and treated her disability during the years immediately following her accident. Thus the ALJ commented that "[i]t would appear that if her condition had been disabling throughout the years from 1974 until 1980, she certainly would have received treatment during that time." Had the ALJ applied SSR 83-20, however, the lack of such evidence could not have been considered determinative. See Lichter v. Bowen, 814 F.2d 430, 435 (7th Cir.1987).
 
 
 48
 In Willbanks v. Secretary of HHS, 847 F.2d 301, 304 (6th Cir.1988), this court said that SSR 83-20 "sets forth the factors that an ALJ must consider when evaluating a claim that a disabling condition occurred prior to a claimant's first recorded medical examination." Concluding that SSR 83-20 required that the claimant's alleged onset date be adopted if consistent with all the evidence available, we reversed a decision of the Secretary that had, in effect, adopted the first date of diagnosis as the onset date.
 
 
 49
 At least two other circuits have concluded that it is not consistent with SSR 83-20 to equate the date of onset with date of diagnosis. In Lichter, supra, the claimant suffered a fractured femur and psychological damage as a result of a 1981 automobile accident. The ALJ selected 1983, the date of diagnosis, as the onset date of disability despite the fact that three therapists had concluded that the claimant's mental impairment related back to his automobile accident. The court found that the claimant's alleged onset date was not clearly inconsistent with the other available evidence, and remanded the case for consideration under SSR 83-20.
 
 
 50
 In Swanson v. Secretary of HHS, 763 F.2d 1061 (9th Cir.1985), the Ninth Circuit found that where the medical evidence supported the existence of a disability that was diagnosed "only at a much later date the Secretary would not be substantively justified in relying on the date of diagnosis as the date of disability." Id. at 1066 n. 2. The court also noted that "the critical date is the date of onset of disability, not the date of diagnosis." Id. at 1065 (emphasis in original).
 
 
 51
 Upon review of the relevant evidence in the case at bar, including the 1973 hospital record and the reports of Drs. Warren, Cox, Monin, Keeley, Callahan, and Blackstone, we can find little room for doubt that the present manifestations of Mrs. Roy's organic brain syndrome--including her psychiatric problems, her seizure disorder, her abnormal EEGs, her severe headaches, and her third cranial nerve palsy--are sequelae of the severe trauma she suffered in the 1973 automobile accident. Both the medical evidence and the testimony of Mr. Roy are consistent with the onset date alleged by the claimant. It seems clear that Mrs. Roy could not reasonably have been expected to engage in substantial gainful activity following her accident. We believe that SSR 83-20 compels the conclusion that the onset date of Mrs. Roy's disability was July 21, 1973.
 
 
 52
 The judgment of the district court is REVERSED, and the case is REMANDED for an award of benefits.